IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:21-cv-125

| | |
|---|---|
| DEATH AND TAXES LLC d/b/a DEATH & TAXES and BRIDGE CLUB; ASPIC, INC. d/b/a POOLE'S DINER; ABC CORNERSHOP, INC. d/b/a BEASLEY'S CHICKEN + HONEY, CHUCK'S BURGERS, and FOX LIQUOR BAR; POOLE'SIDE, LLC d/b/a POOLE'SIDE PIES; and AUX KITCHEN LLC, | **CLASS ACTION COMPLAINT** |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| THE CINCINNATI INSURANCE COMPANY, | |
| *Defendant*. | |

## I.     NATURE OF THE CASE

1.     This is a class action brought by insurance policyholders across North Carolina, seeking a declaratory judgment ordering their insurance provider, The Cincinnati Insurance Company ("Cincinnati"), to honor valid contracts of insurance requiring payment for lost business income, extra expenses, and other business-related losses in light of COVID-19 and the ensuing government actions requiring closure of their covered business premises. This Complaint also seeks damages for breach of contract for benefits due under the insurance policy contracts.

2.     The representative Plaintiffs who bring this action operate six highly-acclaimed restaurants and one bar in Raleigh, North Carolina, including Poole's Diner, Death & Taxes, Beasley's Chicken + Honey, Chuck's Burgers, Poole'side Pies, Bridge Club, and Fox Liquor

1

Bar. The first of these, Poole's Diner, was launched by chef and owner Ashley Christensen in 2007 as a modern diner serving up hearty comfort food rooted in Southern ingredients. Ms. Christensen, whose flair for cooking developed while hosting elaborate dinner parties as an undergraduate at North Carolina State University, is credited with helping ignite the food revolution that has since swept the entire region. Her restaurants are supported by Aux Kitchen, a commissary-catering-test kitchen combination that functions as the nerve center of Ms. Christensen's award-winning operation.

3.       Beginning in March 2020, thousands of businesses across North Carolina were forced to close or severely curtail operations in response to shutdowns ordered by state and local governments. These orders ceased all non-essential travel and imposed a range of "social distancing" requirements. The orders further limited the use of or access to certain business premises by their owners, employees, customers, vendors, and others.

4.       Plaintiffs' businesses were no exception. The mandated closures—and immediate losses in revenue—forced all eight of Plaintiffs' businesses to close. The government orders also forced Plaintiffs to begin laying off employees, many of whom had spent lengthy careers at Plaintiffs' restaurants. As of March 17, 2020, Plaintiffs employed roughly 300 employees, but that number dropped to 50 almost overnight. Plaintiffs even face the prospect of permanent closures.

5.       To protect against these sorts of unanticipated losses, Plaintiffs and members of the class (the "Class") purchased business interruption insurance from The Cincinnati Insurance Company ("Cincinnati"). Business interruption insurance is critical for small- and medium-sized businesses where margins are often razor-thin.

6.      Cincinnati purports to understand this. Cincinnati promises that "[w]hen it comes to paying claims, we'll look for coverage—not exceptions, helping to keep your business running in the event of a claim."[1] Cincinnati markets its business interruption insurance as helping to cover "loss of income and necessary extra expenses you incur to keep your business operating," including lost profits, payroll, taxes, and other operating expenses.[2] Cincinnati assures prospective customers that Cincinnati is "everything insurance should be."[3]

7.      Accordingly, Plaintiffs and the Class selected Cincinnati as their business interruption insurance provider. These policyholders dutifully paid premiums to Cincinnati year-after-year—to the tune of millions of dollars per year—so that when the unimaginable hit, they would be protected. Plaintiffs and the Class purchased "all risks" policies that cover every one of those unimaginable risks unless the policy exclusions remove that risk from coverage.

8.      Nothing in the Cincinnati policies purchased by Plaintiffs and the Class exclude viruses from coverage.

9.      Nor does anything in the policies exclude government shutdown orders. Cincinnati did not choose to exclude all government action from coverage. To the contrary, by expressly excluding only government action ordering the seizure or destruction of property, Cincinnati acknowledged that other government actions are covered perils within the meaning of the policies. Plaintiffs and the Class therefore reasonably believed that their Cincinnati policies

---

[1] Protection for Businesses and Organizations: Fulfilling our Promises, The Cincinnati Insurance Companies, *available at* https://www.cinfin.com/business-insurance (last visited Feb. 18, 2021).
[2] Protection for Your Commercial Property, The Cincinnati Insurance Companies, *available at* https://www.cinfin.com/business-insurance/products/property-insurance (last visited Feb. 18, 2021).
[3] About Us, The Cincinnati Insurance Companies, *available at* https://www.cinfin.com/about-us (last visited Feb. 18, 2021).

3

would cover the extensive losses they have sustained due to the COVID-19 pandemic and the ensuing government orders.

10.     Nevertheless, Cincinnati has reflexively denied claims made by its policyholders. Cincinnati had already decided—even before any claims were filed—that all claims related to government orders limiting the use of or access to covered property are invalid—even where no virus exclusion exists. Simply put, Plaintiffs and the Class did not get what they paid for.

11.     Cincinnati's interpretation of the policy contracts is wrong, and its denial for losses caused by limitations on the physical use of and access to its policyholders' property breached the contracts. This breach has caused widespread economic devastation, wreaking havoc across North Carolina's business community.

12.     Plaintiffs seek for themselves and the Class compensatory damages, special damages, attorney's fees, interest, and declaratory relief.

## II.     <u>JURISDICTION</u>

13.     This Court has subject-matter jurisdiction over the claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

14.     This Court also has subject-matter jurisdiction over the claims asserted by Plaintiffs and the Class pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed on behalf of a North Carolina statewide class under Rule 23 of the Federal Rules of Civil Procedure; there are likely hundreds of proposed class members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one member of the class of plaintiffs is a citizen of a State different from that of the defendant, The Cincinnati Insurance Company.

4

15.     Pursuant to Rule 4 of the Federal Rules of Civil Procedure, personal jurisdiction over defendant The Cincinnati Insurance Company is conferred upon and vested in this Court by virtue of N.C. Gen. Stat. § 1-75.4(1)(d), as Cincinnati is engaged in substantial activity within North Carolina, and N.C. Gen. Stat. §§ 1-75.4(10)(a) and (b), as this matter arises out of contracts of insurance between Cincinnati, and Plaintiffs and the Class, each of whom was a resident of North Carolina at all relevant times during the enforcement in North Carolina of the COVID-19-related government orders described herein.

### III.     VENUE

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)-(d).

### IV.     PARTIES

17.     Plaintiffs Death and Taxes LLC d/b/a Death & Taxes and Bridge Club; ASPIC, INC. d/b/a Poole's Diner; ABC Cornershop, Inc. d/b/a Beasley's Chicken + Honey, Chuck's Burgers, and Fox Liquor Bar; Poole'side, LLC d/b/a Poole'side Pies; and Aux Kitchen LLC (collectively, "Plaintiffs"), contracted with defendant The Cincinnati Insurance Company ("Cincinnati") for commercial property, commercial general liability, and other insurance. Plaintiffs are covered by a single Cincinnati policy: Policy Number ECP 026 00 45.

18.     The policy's effective period is July 8, 2017 through July 8, 2020. *See* **Exhibit A** (original policy). The policy then renewed for the effective period of July 8, 2020 through July 8, 2023. *See* **Exhibit B** (renewal policy). Both the original policy and the renewal policy are the same in all material respects, are typical of policies purchased by the Class, and are referred to collectively herein as "Policy."

19.     Plaintiffs' Policy applies to all eight business locations as specifically identified in the respective Named Insured Schedules.[4]

20.     Plaintiffs own and operate six covered restaurant premises, one bar premise, and one catering kitchen premise which comprise buildings and business personal property located in Raleigh, North Carolina, and include:

      a.     Death & Taxes (105 W Hargett Street, Raleigh, NC 27601);

      b.     Bridge Club (105 W Hargett Street, Raleigh, NC 27601);

      c.     Poole's Diner (426 S McDowell Street, Raleigh, NC 27601);

      d.     Beasley's Chicken + Honey (237 S Wilmington Street, Raleigh, NC 27601);

      e.     Chuck's Burgers (237 S Wilmington Street, Raleigh, NC 27601);

      f.     Fox Liquor Bar (237 S Wilmington Street, Raleigh, NC 27601);

      g.     Poole'side Pies (428 S McDowell Street, Raleigh, NC 27601);

      h.     Aux Kitchen (1519 Brookside Drive, Raleigh, NC 27604).

21.     Plaintiffs Death and Taxes LLC d/b/a Death & Taxes and Bridge Club; Poole'side, LLC d/b/a Poole'side Pies; and Aux Kitchen LLC are all domestic limited liability companies headquartered in Raleigh, North Carolina, and are all citizens of North Carolina.

22.     Plaintiffs ASPIC, INC. d/b/a Poole's Diner and ABC Cornershop, Inc. d/b/a Beasley's Chicken + Honey, Chuck's Burgers, and Fox Liquor Bar are both domestic S-corporations headquartered in Raleigh, North Carolina, and are both citizens of North Carolina.

---

[4] Plaintiff Poole'side, LLC d/b/a Poole'side Pies was added to the original policy by endorsement effective July 24, 2019 for an additional premium. *See* **Exhibit C** (Endorsement 12). While Cincinnati mistakenly failed to name Aux Kitchen LLC on the original policy, Cincinnati provided coverage for claims made by Aux Kitchen LLC during the original policy's effective dates, thereby disclaiming any argument that Aux Kitchen LLC was not properly covered under the original policy when the losses herein described were sustained.

23.     Upon information and belief, defendant The Cincinnati Insurance Company is an Ohio corporation with its principal places of business in Fairfield, Ohio, and is a citizen of Ohio.

## V.     FACTUAL BACKGROUND

### A.     The COVID-19 Pandemic

24.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("COVID-19").

25.     According to the World Health Organization ("WHO"): "People with the virus in their noses and throats may leave infected droplets on objects and surfaces (called fomites) when they sneeze, cough on, or touch surfaces, such as tables, doorknobs and handrails. Other people may become infected by touching these objects or surfaces, then touching their eyes, noses or mouths before cleaning their hands."[5]

26.     Short of widespread vaccination, the Centers for Disease Control ("CDC") emphasizes that social distancing is the best tool to slow the COVID-19 outbreak as it "helps limit opportunities to come in contact with contaminated surfaces and infected people outside the home."[6]

27.     Although COVID-19 droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

---

[5] *See* Q&A: How is COVID-19 transmitted?, World Health Organization (July 14, 2020), *available at* https://www.who.int/vietnam/news/detail/14-07-2020-q-a-how-is-covid-19-transmitted (last visited Feb. 19, 2021).
[6] *See* "Social Distancing," Centers for Disease Control (Nov. 17, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Feb. 18, 2021).

28.     These droplets can spread COVID-19 when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[7]

29.     Droplets containing COVID-19 infect a variety of surfaces and objects for a period of a hours, days, or weeks, if not longer. After inspecting a cruise ship inhabited by passengers who carried COVID-19, the CDC reported that the virus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[8]

30.     Scientific evidence shows that COVID-19 can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[9] These materials are prevalent and unavoidable throughout facilities operated by Plaintiffs and the Class.

31.     Research has even shown that COVID-19 can persist on surfaces under certain conditions commonplace in facilities operated by Plaintiffs and the Class for up to 28 days.[10]

---

[7] *See, e.g.*, "How COVID-19 Spreads," Centers for Disease Control (Oct. 20, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Feb. 18, 2021).

[8] *See* Leah E. Moriary *et al.*, "Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldwide, February-March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (Mar. 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited Feb. 17, 2021).

[9] *See* Neeltje van Doremalen *et al.*, "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited Feb. 19, 2021); Alex W.H. Chin *et al.*, "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (Apr. 2, 2020), *available at* https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited Feb. 19, 2021).

[10] Gunter Kampf *et al.*, Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents, 104 J. Of Hospital Infection 246 (2020), *available at* https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (last visited Feb. 19, 2021).

8

**B.      The COVID-19 Pandemic Hits North Carolina**

32.      The first public reports of the virus spreading to humans were issued in or around December 2019, resulting from an outbreak of the virus in Wuhan, China.

33.      On January 21, 2020, the CDC reported the first American COVID-19 case in the State of Washington.

34.      On March 3, 2020, the North Carolina Department of Health and Human Services ("NCDHHS") reported the first case of COVID-19 in North Carolina. The infected individual was exposed to an outbreak at a long-term care facility in the State of Washington. The individual then returned home to Wake County, North Carolina, flying through Raleigh-Durham International Airport on February 22, 2020, and testing positive on March 3, 2020.

35.      COVID-19 then spready rapidly across North Carolina. Within just two weeks, by March 17, 2020, there were 330 confirmed cases of COVID-19 in North Carolina.

36.      Further, multiple structures across North Carolina reported COVID-19 infections or outbreaks and were in fact physically impacted by the presence of the COVID-19 virus on or around the surfaces of these structures.

37.      For example, the Wake County Department of Health and Human Services notified So.Ca, a Raleigh restaurant, that the county's first COVID-19 patient had dined there on February 28, 2020.[11] The following day, workers from Enviro-Master, a national health and safety company, deep-cleaned the entire restaurant while wearing protective suits and using an electrostatic sprayer to cover surfaces with a hospital-grade germicide. The restaurant

---

[11] *See* Martha Quillen *et al.*, Health officials are watching NC patient's contacts for signs of coronavirus spread, The News & Observer (Mar. 4, 2020), *available at* https://www.newsobserver.com/news/local/article240879631.html (last visited Feb. 17, 2021).

9

additionally bleached, rinsed, and sanitized every piece of silverware, glassware, plateware, and every table, door handle, touch screen, chair and cushion.[12]

38.     Yet, throughout the entire period from December 2019 through March 16, 2020, Plaintiffs did not suffer closures or interruptions of their thriving businesses.

**C.     North Carolina Limits Use of and Access to Food and Beverage Facilities**

39.     It was when North Carolina's state and local governments entered civil authority orders beginning in March 2020 that Plaintiffs and the Class were forced to close or curtail their business operations.

40.     On March 10, 2020, North Carolina Governor Roy Cooper entered Executive Order 116, declaring a "state of emergency to coordinate response and protective actions to prevent the spread of Covid-19." *See* **Exhibit D** (State of North Carolina Executive Order No. 116).[13]

41.     On March 14, 2020, Governor Cooper entered Executive Order 117, which prohibited gatherings of more than 100 persons in a single room or space at the same time. Order 117 further urged all persons to maintain a social distance of six feet from all other people. *See* **Exhibit E** (State of North Carolina Executive Order No. 117).

42.     On March 17, 2020, Governor Cooper entered Executive Order 118, which imposed sweeping limitations on the use of and access to food and beverage facilities. Order 118

---

[12] *See* Brian Mims, *et al.*, Raleigh restaurant professionally cleaned after coronavirus patient ate there, WRAL (Mar. 5, 2020), *available at* https://www.wral.com/raleigh-restaurant-professionally-cleaned-after-coronavirus-patient-ate-there/18993396/ (last visited Feb. 18, 2021).
[13] All statewide executive orders referenced herein can be found online at the State of North Carolina's website. *See* "COVID-19 Orders," *available at* https://www.nc.gov/covid-19/covid-19-orders (last accessed Feb. 16, 2021). Moreover, for convenience and where noted, true and correct copies of certain applicable government orders referenced herein are attached as exhibits to this complaint.

10

required restaurants to "limit the sale of food and beverages to carry-out, drive-through, and delivery only." Further, under Order 118, the State Health Director, acting pursuant to quarantine and isolation authority provided by N.C. Gen. Stat. § 130A-145, "limit[ed] access to facilities that sell food and beverage to carry-out, drive-through and delivery services only." Order 118 defined the State's "quarantine authority" to mean "the authority to issue an order to limit access by any person or animal to an area of facility that may be contaminated with an infection agent." Order 118 also defined "quarantine authority" as allowing the State "to limit the freedom of movement or action of persons or animals which [have] been exposed to or are reasonably suspected of having been exposed to a communicable disease" in order to prevent further transmission. Order 118 closed bars outright with no exceptions. Finally, Order 118 amended Order 117 to extend the prohibition on gatherings of more than 100 persons to restaurants. *See* **Exhibit F** (North Carolina Executive Order No. 118).

43.     On March 17, 2020, the Secretary of the North Carolina Department of Health and Human Services, Dr. Mandy Cohen, entered an order carrying out the directives of Order 118. The order, entitled Order of Abatement of Imminent Hazard ("NCDHHS Order"), required the immediate closure of all restaurant seating areas and the full closure of all bars. Specifically, the NCDHHS Order explained that Secretary Cohen had found the existence of an "imminent hazard," defined by statute to mean, *inter alia*, any situation "likely to cause an immediate threat to human life, an immediate threat of serious physical injury, [or] an immediate threat of serious adverse health effects . . . if no immediate action is taken." Upon finding an imminent hazard, "the Secretary may order the owner, lessee, operator, or other person in control of the property to abate the imminent hazard." Thus, Secretary Cohen found "that the use of seating areas of

11

restaurants and bars constitutes an imminent hazard for the spread of COVID-19," and therefore ordered all such areas to close immediately. *See* **Exhibit G** (NCDHHS Order).

44.     On March 23, 2020, Governor Cooper entered Executive Order 120, which further limited gatherings to no more than 50 persons in a single room or space at the same time. Order 120 also broadened the limitations on restaurants set forth in Order 118 to apply to all "dining facilities," and ordered closed all entertainment facilities without a retail or dining component including, but not limited to, bingo parlors, bowling alleys, indoor exercise facilities, health clubs, pools, live performance venues, movie theaters, skating rinks, spas, and gaming establishments. Order 120 further closed all personal care and grooming businesses including, but not limited to, barber shops, beauty salons, hair salons, nail salons, massage parlors, and tattoo parlors. *See* **Exhibit H** (North Carolina Executive Order No. 120).

45.     On March 27, 2020, Governor Cooper entered Executive Order 121, requiring individuals to shelter in place at their residence except to conduct certain enumerated essential activities, and to maintain social distancing of at least six feet. The order also prohibited travel except for those same essential activities. The order required non-essential businesses and operations to cease, and defined restaurants as non-essential except for the narrow purpose of preparing food for off-premises consumption only, assuming social distancing requirements could be met. The order continued the complete closure of all bars. *See* **Exhibit I** (North Carolina Executive Order No. 121).

46.     Executive Order 121 did permit essential and non-essential businesses alike to carry out certain "Minimum Basic Operations," but defined the term narrowly to exclude income-generating activities at restaurants. The order defined "Minimum Basic Operations" to include, in relevant part, "minimum necessary activities to maintain the value of the business's

12

inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits." Order 121, by its express terms, was entered under the State's statutory authority (i) "to prohibit and restrict the operation of . . . business establishments," and (ii) "to prohibit and restrict activities which may be reasonably necessary to maintain order and protect lives and property during a state of emergency." *See id.*

47.     Executive Order 121 also set forth "Social Distancing Requirements," requiring that all businesses continuing to operate under the terms of the order comply with, *inter alia*, the following: (i) maintenance of at least six feet distancing from other individuals; (ii) washing hands using soap and water for at least twenty seconds as frequently as possible or the use of hand sanitizer; and (iii) regularly cleaning high-touch surfaces. The order further limited gatherings to no more than ten people. *See id.*

48.     On April 9, 2020, Governor Cooper entered Executive Order 131, mandating all retail establishments still permitted to operate under prior orders to follow "Additional Social Distancing Requirements." Those additional requirements included, in relevant part:

      a.    Limiting the maximum occupancy to no more than twenty percent of the retail establishment's stated fire capacity, or to five customers for every one thousand square feet of the retail location's total square footage;

      b.    Upon reaching the maximum occupancy limit, posting staff at entrances and exits to enforce the occupancy limits;

      c.    Marking clearly six feet of spacing in lines at cash registers and other high traffic areas inside the retail establishment;

      d.    Marking clearly six feet of spacing in a designated line outside the retail establishment; and

      e.    Frequent and routine environmental cleaning and disinfecting of high-touch areas with a disinfectant approved by the Environmental Protection Agency ("EPA") for COVID-19.

13

The order further encouraged all retail establishments to take the following additional protective steps:

a.      Use of cloth face coverings for all employees in positions that do not allow for appropriate social distancing;

b.      Marking clearly six feet of spacing in high traffic areas within the staff-only portions of the premises;

c.      Placing of hand sanitizer prominently at entry and exit points;

d.      Posting signs conveying the terms of the required social distancing; and

e.      Use of acrylic or plastic shields at points of sale.

Order 131, by its express terms, was entered pursuant to the same statutory authority as Order 121, authorizing the prohibition and restriction of business operations to protect property during a state of emergency. *See* **Exhibit J** (North Carolina Executive Order No. 131).

49.      Statewide authorities in North Carolina have since entered additional government orders that continue to impose restrictions and limitations. These orders were entered under substantially the same statutory authority as described above. Governor Cooper, for example, entered Executive Order 163 on September 4, 2020, which continued to restrict capacity in all restaurants. Governor Cooper later entered Executive Order 181 on December 8, 2020, which continued the complete closure of all indoor seating areas and indoor amenities of bars. To date, these additional orders continue to prohibit the full use of and access to a variety of business premises and business personal property owned and operated by Plaintiffs and the Class. These orders include, but are not limited to, Executive Orders 138, 141, 147, 151, 153, 155, 163, 169, 180, 181, 183, 189, and 190. *See* "COVID-19 Orders," *available at* https://www.nc.gov/covid-19/covid-19-orders (last accessed Feb. 16, 2021).

14

50.     Local and municipal governments across North Carolina entered their own orders mandating that residents shelter in place and that businesses limit or cease operations. Often these local orders mandated more stringent restrictions on the movement of people and the use or access to goods, services, and facilities.

51.     For example, beginning in March 2020, Wake County entered a series of orders with substantially the same requirements as the statewide orders described above, except the orders imposed additional social distancing and sanitation requirements. These requirements were often stricter than the statewide orders, including, for example, prohibiting customers from entering non-essential business premises; performing temperature checks by employers of their employees; requiring any employee with a temperature above 100.4 degrees Fahrenheit to be sent home; and forbidding handshakes. The Wake County orders explained that the forgoing emergency protective restrictions were entered in part for the "protection of lives, safety and property during this emergency," and because "the spread of the disease poses an imminent threat to property in the County."

52.     Under each successive order, businesses and covered premises owned by Plaintiffs and the Class were limited to essential activities, minimum necessary operations, or required closure. The government actions also prohibited, via stay-at-home orders or travel restrictions, all nonessential movement by all residents. These government orders resulted in losing physical use of, physical access to, and physical enjoyment of property by Plaintiffs, the Class, and their owners, customers, vendors, employees, and others. The practical upshot was that the government orders effectively foreclosed use of these business premises and business personal property as a whole.

15

**D.    Plaintiffs and the Class Purchase "All Risks" Insurance Policies**

53.    To protect their thriving businesses from interruption and other perils, Plaintiffs, like thousands of other policyholders, purchased commercial insurance from Cincinnati including coverage for loss of business income, extra expense, civil authority, general liability, and other coverages. Because their Policy did not exclude viruses, Plaintiffs fully and reasonably believed that Cincinnati would cover their losses due to the government orders described herein.

54.    Plaintiffs' Policy is typical of the Cincinnati policies purchased by the Class. As the Policy makes clear, Cincinnati—as sole drafter of the Policy—relied on materials generated by the Insurance Services Office ("ISO") in drafting Plaintiffs' Policy. The ISO is a for-profit company that drafts template policy forms for use in insurance contracts. Insurance providers that subscribe to ISO rely on the ISO's template forms to develop their own proprietary forms.

55.    Cincinnati is an ISO subscriber with access to the ISO's full range of template policy language and template policy forms. In developing the business interruption policies sold to Plaintiffs, Cincinnati modified the ISO's templates. Cincinnati then sold these proprietary forms to purchasers of business interruption insurance. These Cincinnati form policies— identified herein by their Cincinnati-specific form and policy numbers—are non-negotiable and sold "as is," meaning they are standardized across the Class. Plaintiffs' Policy is therefore typical of the policies purchased by all members of the Class.

56.    Plaintiffs' Policy consists of the policy jacket and its policy provisions, the declarations or information pages, and the endorsements.

57.    In exchange for payment of the premiums, Cincinnati agreed to provide the insurance coverages described in Plaintiffs' Policy.

16

58.     The Policy is an "all risks" policy. That is, the Policy covers the insured for any peril, imaginable or unimaginable, unless expressly excluded or limited. In the event a covered peril results in direct loss to Plaintiffs' property at a covered premises, the Policy will pay for lost business income and extra expenses. Business income means net income (net profit or loss) that would have been earned had no direct loss occurred, together with continuing normal operating expenses (including payroll). Extra expenses means the costs incurred because of the direct loss—that is, those costs that would have otherwise been avoided. In the event of a direct loss, the Policy pays for both.

59.     Specifically, as the Common Policy Declarations state, *see* Form ICP 517 07 11 at p. 1, the Policy provides commercial property coverage on Form FM 502. The first page of Form FM 502, entitled Commercial Property Coverage Part Declarations, *see* Form FM 502 07 08 at p. 1, indicates that the Policy covers business income and extra expenses. The Building and Personal Property Coverage Form, in turn, sets forth the specifics of the coverage for "Business Income" and "Extra Expense." *See* Form FM 101 05 16 at ¶¶ E.b.1 and E.b.2.

60.     The Business Income coverage provides that Cincinnati must:

> "pay for the actual loss of 'Business Income' and 'Rental Value' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss."

17

61.     The Extra Expense coverage provides that Cincinnati must pay:

"necessary expenses you sustain . . . during the 'period of restoration' that you would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss."[14]

62.     The Business Income and Extra Expense paragraphs also establish the applicable "Covered Causes of Loss," which the Policy defines as "direct 'loss' unless the 'loss' is excluded or limited" by the Commercial Property Coverage part. This language covers all risks unless excluded by Paragraph A.3.b or limited by Paragraph A.3.c.

63.     The Policy contains several exclusions, which identify risks that disclaim coverage for direct losses caused by those risks.

64.     None of the exclusions in the Policy disclaim coverage for the government orders pursuant to which Plaintiffs suspended their business operations. The government orders therefore constitute a covered "direct loss" under the Policy.

65.     Nor do any exclusions in the Policy disclaim coverage for loss or damage caused by the COVID-19 virus itself, whether at Plaintiffs' covered premises or at any other premises. The Policy does not exclude viruses or virus-related causes of direct loss. Any losses Plaintiffs sustained caused by action of civil authority prohibiting access to their covered premises in response to the COVID-19 pandemic are therefore also covered under the Policy.

---

[14] The Policy separately provides for Business Income and Extra Expense coverage on the Business Income (and Extra Expense) Coverage Form. *See* Form FA 213 05 16 at ¶¶ A.1 and A.2.

18

**E.** **Cincinnati Has Not Paid and Never Had Any Intention of Paying Insurance Claims Filed by Plaintiffs and the Class**

66. While representing to its insureds that it will diligently investigate business interruption claims connected to the COVID-19 pandemic, Cincinnati told investors the truth: that it will not honor such claims.

67. Specifically, in its 10-Q filing for Q1 2020, Cincinnati stated:

> Virtually all of our commercial property policies do not provide coverage for business interruption claims unless there is direct physical damage or loss to property. Because a virus does not produce direct physical damage or loss to property, no coverage exists for this peril – rendering an exclusion unnecessary. For this reason, most of our standard market commercial property policies in states where we actively write business do not contain a specific exclusion for COVID-19. While we will evaluate each claim based on the specific facts and circumstances involved, our commercial property policies do not provide coverage for business interruption claims unless there is direct physical damage or loss to property.[15]

68. Consistent with this position, Cincinnati provided a letter responding to Plaintiffs' claims, twice stating: "Your notice of claim indicates that your claim involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises." *See* **Exhibit K** (reservation of rights letter). Cincinnati's letter not only ignored the government orders that form the central basis of Plaintiffs' claims, but it demanded additional information prior to rendering a coverage decision under the guise of conducting an investigation. But the 10-Q reveals Cincinnati's purported investigation for what it is: a red herring. Cincinnati never had any intention of paying Plaintiffs' claims.

---

[15] *See* Form 10-Q, Cincinnati Financial Corporation (filed Apr. 27, 2020), *available at* https://cincinnatifinancialcorporation.gcs-web.com/static-files/787fd5db-ee48-474b-98b1-4d7186fa8fb5 (last visited Feb. 16, 2021). Cincinnati continues to maintain this position despite a pro-coverage judicial ruling in North Carolina state court. *See* Form 10-K, Cincinnati Financial Corporation (filed Feb. 25, 2021), *available at* https://cincinnatifinancialcorporation.gcs-web.com/sec-filings/sec-filing/10-k/0000020286-21-000013 (last visited Feb. 26, 2021).

19

69.     As the 10-Q and letter make clear, Cincinnati's premeditated strategy to deny all COVID-19-related claims applies *even where an insured's policy has no virus exclusion*.[16]

70.     Given Cincinnati's intention to issue categorical denials of all claims arising out of the COVID-19 pandemic, it is no surprise that Cincinnati denied Plaintiffs' claims without evaluating how each business was restricted by government order. Cincinnati failed to evaluate ample publicly-available and easily-accessible information regarding these shutdown orders, nor did Cincinnati conduct a fair and neutral individualized investigation. Further, Cincinnati never made any indication that it had visited or planned to visit any of the covered locations, or that it had secured an outside counsel opinion on coverage to avoid bias.

71.     Cincinnati's repudiation of the insurance contract that Plaintiffs' purchased to protect their businesses and employees is unlawful. The government actions affecting Plaintiffs' property have caused a loss of income and an increase in expense. This risk—of government action—is nowhere limited or excluded in the Policy.

## VI.     CLASS ALLEGATIONS

72.     Plaintiffs bring this action pursuant to Rules 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and the following Class:

> All policyholders in the State of North Carolina who purchased a policy issued by defendant The Cincinnati Insurance Company with coverage for Business Income, Extra Expense, and/or Civil Authority, whose policy does not contain a virus exclusion, and whose operations were suspended, in whole or in part, by a Government Order during the period in which the purchased policy was in effect.

---

[16] Plaintiffs submitted business interruption insurance claims to Cincinnati on March 25, 2020, indicating March 17, 2020—the date of entry of the first relevant government shutdown order—as the date of loss. Plaintiffs' claim number is: 3525935.

Government Order means any order issued by any government authority in North Carolina, including but not limited to those orders entered by any state, county, or municipal authority on or after February 1, 2020, that limit or otherwise impose burdens on a policyholders' use of or access to covered property in light of COVID-19, including but not limited to the government orders described herein. Excluded from this Class are defendant The Cincinnati Insurance Company and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, and assigns; government entities; Class counsel and their employees; and the judicial officers and Court staff assigned to this case and their immediate families.

73.     While the exact number of Class members cannot be determined, the Class consists of at least hundreds of policyholders, making joinder impractical, in satisfaction of Rule 23(a)(1) of the Federal Rules of Civil Procedure. The exact number of Class members can readily be ascertained by documents maintained by Cincinnati.

74.     With respect to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of fact and law common to the Class, including:

a.     Whether the Government Orders are a "covered cause of loss";

b.     Whether losses caused by limits or prohibitions on using or accessing insured real property or employing or putting into service (or removing therefrom) insured equipment/business property are direct physical losses;

c.     Whether the Policy was breached when Cincinnati denied coverage for claims made due to government orders that limited or prohibited access to or use of covered property without seizing or destroying it;

d.     Whether the Policy's "loss of use" exclusion is limited to consequential, indirect losses rather than losses directly caused by or resulting from government action;

e.     Whether Cincinnati's breaches injured Plaintiffs and the Class;

f.     Whether Plaintiffs and the Class are entitled to damages;

21

g.      Whether Plaintiffs and the Class may have an award of attorney's fees;

h.      Whether Plaintiffs and the Class may have an award of pre- and post-judgment interest;

i.      Whether Plaintiffs and the Class are entitled to declaratory relief.

75.     With respect to Rule 23(a)(3) of the Federal Rules of Civil Procedure, Plaintiffs have the same interests as all other members of the Class and Plaintiffs' claims are typical of those of all members. Plaintiffs' claims are coincident with and not antagonistic to those of other Class members they seek to represent. The damages of each Class member were caused by Cincinnati's wrongful conduct.

76.     With respect to Rule 23(a)(4) of the Federal Rules of Civil Procedure, Plaintiffs have retained competent Class counsel experienced in insurance litigation and class action litigation, and Plaintiffs will fairly and adequately represent the interests of the Class members.

77.     Class certification is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Cincinnati's actions generally apply to the Class as a whole and Plaintiffs seek equitable remedies regarding the Class as a whole.

78.     Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' counsel, experienced in insurance and class action litigation, foresee little difficulty in the management of this matter as a class action. The members of the Class are ascertainable from Cincinnati's records and Cincinnati possesses contact information of Class members for class notice.

22

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment for Business Income and Extra Expense Coverage)

79.     Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

80.     Plaintiffs bring this cause of action for themselves and the Class under Rule 57 of the Federal Rules of Civil Procedure and under 28 U.S.C. § 2201, seeking a declaration that (i) the government orders entered in North Carolina constitute covered perils that caused "direct 'loss' to property" at the described premises under the all-risks policies purchased by Plaintiffs and the Class, and (ii) that therefore Cincinnati must pay for the resulting lost business income and extra expenses as defined by those same policies.

81.     Under the Business Income coverage purchased by Plaintiffs and the Class, Cincinnati must "pay for the actual loss of 'Business Income' and 'Rental Value' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'"

82.     Under the Extra Expense coverage, Cincinnati must pay the "necessary expenses you sustain . . . during the 'period of restoration' that you would not have sustained if there had been no direct 'loss' to property . . . ."

83.      "[S]uspension" means: "(a) The slowdown or cessation of your business activities; and (b) That a part or all of the 'premises' is rendered untenantable."

84.      "[O]perations" means: "(a) Your business activities occurring at the 'premises'; and (b) The tenantability of the 'premises,' . . . ."

85.      "[P]eriod of restoration" means: "the period of time that: (a) Begins at the time of direct 'loss' [and] (b) Ends on the earlier of: (1) The date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; (2) The date

23

when business is resumed at a new permanent location; or (3) 12 consecutive months after the date of direct 'loss.'"

86.  "[L]oss" means "accidental physical loss or accidental physical damage."

87.  Additionally, under Business Income and Extra Expense coverage, the suspension must be caused by "direct 'loss' to property" at the relevant premises.

88.  As discussed in more detail below, Cincinnati's interpretation that the requirement of "direct loss" or "accidental physical loss" is not satisfied by losing physical access or use and quiet enjoyment of Plaintiffs' and Class members' property is wrong. Cincinnati chose not to define these terms to have the meanings Cincinnati now asserts against its insureds. Both undefined phrases are reasonably construed, however, to mean the loss of the ability to physically access or use property. Losing the ability to access or use one's property is a direct loss of physical, material rights and advantages, substantial and important. Considering that exclusions to coverage must be narrowly construed; that language drafted by the insurer with ambiguity must be construed against the drafter; and that the interpretation offered by Plaintiffs and the Class is supported by dictionary definitions of the terms, coverage should be afforded.

A.  **Loss of Access or Use Constitutes Direct Loss**

89.  The policies purchased by Plaintiffs and the Class do not define the phrases "direct loss" nor "accidental physical loss."

90.  Common usage of the words in these phrases dictates that ouster and prohibition/interdiction of access and use by insureds and insureds' agents, employees, and customers are physical losses. Such losses are direct in that ouster of and prohibition/interdiction of access and use by all nonessential people results directly in a physical loss.

24

91. Physical means relating to "material things" that are "perceptible especially through the senses."[17] It is also defined in a way that is tied to the body: "of or relating to the body." *Id.* Another Merriam-Webster Dictionary defines the concept of physical this way: "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary."[18]

92. Prohibiting or limiting the physical presence on the premises of any or all persons (except for those facilitating minimal maintenance or narrow essential activities) and the prohibition or limitation of the physical use of equipment, fixtures and furniture constitutes a physical loss that caused the suspension of business operations.

93. Such direct losses are also accidental. Accidental means "occurring unexpectedly or by chance."[19] Government orders of the kind described herein were in no way expected by insureds entering into insurance policies with Cincinnati prior to the COVID-19 pandemic.

**B. Government Action Resulted in the Loss of Use or Access to Covered Premises and Business Personal Property, a Non-Excluded Direct Loss**

94. Under the "all risks" policies purchased by Plaintiffs and the Class, coverage is provided for any risk of direct loss unless expressly limited or excluded.

95. One risk addressed in the exclusions is government action. *See* Form FM 101 05 16, Section A, ¶ 3.b.1.c.

96. By recognizing government action in the exclusions, Cincinnati implicitly recognized government action as a risk of direct loss and a Covered Cause of Loss.

---

[17] "Physical." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical (last visited Feb. 19, 2021).
[18] "Physical." Webster's Third New International Dictionary, Unabridged. 2020. Web. 24 Apr. 2020.
[19] "Accidental." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/accidental (last visited Feb. 19, 2021).

97.     Plaintiffs' and Class members' policies exclude some but not all government action from coverage. Specifically, the policies exclude coverage for any loss caused directly or indirectly by government action only to the extent the government action seizes or destroys property (unless the destruction was done to prevent the spread of a fire). As ordinarily used, "seizure" means "taking possession of person or property by legal process."

98.     The government orders affecting Plaintiffs' and Class members' property do not require seizure or destruction because the government did not destroy these properties or take physical possession of, or title to, such properties. Instead, the orders limited access to and use of covered property at the premises described in the insureds' respective policy declarations.

99.     Therefore, Plaintiffs' and Class members' policies do not exclude the government actions described herein.

100.    The business-income losses, extra expenses, and other losses sustained by Plaintiffs and the Class were caused by or resulted from the aforementioned government orders, a Covered Cause of Loss.

101.    Plaintiffs' and Class members' policies further require that the business-income losses be incurred because of the necessary suspension of operations during the period of restoration. Plaintiffs and the Class suffered losses because of suspensions of operations during the period of restoration.

102.    The direct loss of physical access to and use of the premises listed in the declarations, and business property thereon, for Plaintiffs and the Class, and their vendors, agents, employees, and customers, caused the suspension of their operations.

26

103.     Because the policies cover all risks, including the risk of government action that, for the good of the public, does no more than limit physical access to and use of property (real and personal), coverage is required, beginning at the time of government action.

104.     The government actions affecting property—executive and other orders that directly or indirectly limit direct physical access to real and personal property owned and operated by Plaintiffs and the Class—have caused a loss of income and an increase in expense, exactly the "outside force" that interrupts business and causes insureds to close their doors for a period of time, that requires that capital continue to flow to keep the business afloat and to help replace lost income and pay expenses such as salaries and mortgages. This government action is precisely the unexpected jolt that motivates the purchase of insurance.

**C.      No Other Exclusions Apply to Preclude Coverage**

105.     No other applicable exclusions or limitations apply to preclude coverage for the direct losses caused by or resulting from the government actions described herein.

106.     In the commercial property policies sold to Plaintiffs and the Class, Cincinnati failed to exclude losses arising from viruses or virus-related causes.

107.     Nor does the provision excluding "Delay, loss of use or loss of market" preclude coverage. The provision reads in full:

> "We will not pay for 'loss' caused by or resulting from any of the following: . . . (b) . . . Delay, loss of use or loss of market."

108.     This provision means Cincinnati will not pay for losses caused by or resulting from any "loss of use." Losses are excluded under this provision only to the extent they flow from the "loss of use." Here, losses incurred by Plaintiffs and the Class were not caused by and do not flow from the "loss of use." Rather, their loss *is* the "loss of use," which itself was caused

27

by the government orders. The insured-against peril—government action—resulted directly and immediately in the insureds' direct physical loss of access or use.

109.    Put differently, the exclusion for "loss of use" applies only to losses that are consequential. Consequential losses, or consequential damages, are special or indirect damages. In other words, consequential damages are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act. — Also termed *indirect damages*."[20] The losses suffered by Plaintiffs and the Class are not consequential.

110.    Limiting the "loss of use" exclusion to consequential losses also renders sensible an exclusion that otherwise swallows the entire policy.

**D.    Declaratory Relief**

111.    Plaintiffs and the Class seek a declaration of rights under the language of their Cincinnati policies and a declaration of the rights and liabilities of the parties herein.

112.    Specifically, Plaintiffs and the Class seek a Declaratory Judgment finding that (i) the government orders entered in North Carolina constitute covered perils that caused "direct 'loss' to property" at the described premises under the all-risks policies purchased by Plaintiffs and the Class, and (ii) that therefore Cincinnati must pay for the resulting lost business income and extra expenses as defined by those same policies.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment for Civil Authority Coverage)**

113.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

114.    Under the policies purchased by Plaintiffs and the Class, Cincinnati provides an independent basis of coverage for Business Income and Extra Expense when civil authorities

---

[20] *Consequential Damages*, Black's Law Dictionary (11th ed. 2019) (emphasis in original).

28

take certain actions. Plaintiffs bring this second cause of action for themselves and the Class under Rule 57 of the Federal Rules of Civil Procedure and under 28 U.S.C. § 2201, seeking a declaration that Cincinnati must pay for business income and extra expense under the "Civil Authority" coverage.

115.    The Civil Authority coverage provides, in relevant part:

> "When a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises', we will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises', provided that both of the following apply:
>
> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage . . . ."

## A.    COVID-19 Is A Covered Cause of Loss Under Cincinnati's Policies

116.    Nothing in Plaintiffs' or Class members' policies excludes coverage for virus-related causes of loss.

117.    As explained, Cincinnati—as sole drafter of these policies—relied on materials generated by the Insurance Services Office ("ISO"), to which Cincinnati subscribes.

118.    Notably, the ISO and insurance providers like Cincinnati became aware of the possibility of virus-related causes during multiple prior health-related crises, including: the 2002 SARS epidemic (Severe Acute Respiratory Syndrome); 2009 H1N1 swine flu pandemic; 2012 MERS epidemic (Middle East Respiratory Syndrome); 2014 Ebola epidemic; and the 2016 Zika epidemic, among others.

119.    In 2006, after the SARS epidemic, the ISO drafted a new endorsement, Form CP 01 40 07 06, entitled "Exclusion of Loss Due to Virus or Bacteria," acknowledging that claims

for business interruption losses could be filed under existing policy language for losses resulting from pandemics or the presence of disease-causing agents. This new endorsement, which other insurance providers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

120.    Despite the widespread recognition of virus-related causes of loss, and the ISO's publication of a new endorsement memorializing an express virus exclusion, Cincinnati did not include a virus exclusion in the policies sold to Plaintiffs and the Class. Under these "all-risks" policies, COVID-19 constitutes a Covered Cause of Loss.

**B.      Coverage Is Warranted Under the Civil Authority Provision**

121.    When preparing Form CP 01 40 07 06, the ISO circulated a statement to state insurance regulators that included the following acknowledgment:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.[21]

122.    The insurance industry has thus recognized since 2006 that the presence of virus can constitute damage to property.

---

[21] Larry Podoshen, New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria, Insurance Services Office Circular (July 6, 2006), *available at* https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf (last visited Feb. 19, 2021).

30

123.    COVID-19—a non-excluded Covered Cause of Loss—has been found present on or within property other than the insureds' covered premises, damaging those properties.

124.    Cincinnati does not define the term "damage." According to the Oxford English Dictionary, "Damage" means "[p]hysical harm caused to something in such a way as to impair its value, usefulness, or normal function."[22] Black's Law Dictionary supplies a related definition: "(1) Loss or injury to person or property; esp., physical harm that is done to something or to part of someone's body. (2) By extension, any bad effect on something."[23]

125.    COVID-19 alters the physical landscape of the surfaces on which it is present, rendering those surfaces impure and consequently impairing their value and usefulness. While COVID-19 may be smaller and less visible than rust, mold, or paint, the virus has mass and is necessarily physical in nature, traveling to other objects and causing harm.

126.    Moreover, access to the area immediately surrounding that damaged property has been prohibited by civil authority as a result of the damage, as described herein.

127.    The Civil Authority provisions further require that the government actions are "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage."

128.    Cincinnati chose not to define the term "dangerous physical conditions." According to Merriam-Webster dictionary, "Dangerous" means "(1) involving possible injury, pain, harm, or loss . . . (2) able or likely to inflict injury or harm."[24] The presence of COVID-19 results in conditions that are both dangerous and physical. And by their own terms, the

---

[22] "Damage." Lexico.com, Oxford English Dictionary,
https://www.lexico.com/en/definition/damage (last visited Feb. 19, 2021).
[23] *Damage*, Black's Law Dictionary (11th ed. 2019).
[24] "Dangerous." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/dangerous (last visited Feb. 19, 2021).

31

government orders described herein were entered in response to these dangerous physical conditions resulting from the damage or continuation of COVID-19 that caused the damage at properties other than the insureds' properties.

## C.     Declaratory Relief

129.     Plaintiffs and the Class seek a declaration of rights under the language of their Cincinnati insurance policies and a declaration of the rights and liabilities of the parties herein.

130.     Plaintiffs and the Class seek a Declaratory Judgment finding that their Cincinnati policies cover Business Income and Extra Expense due to action of civil authority arising from damage to property other than their respective covered properties caused by COVID-19.

131.     Coverage is warranted and begins at the time of government action.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract Against Cincinnati)

132.     Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

133.     Plaintiffs and the Class have valid contracts of insurance with Cincinnati, whereby they agreed to make and did make premium payments to Cincinnati in exchange for Cincinnati's promise to indemnify losses including, but not limited to, Business Income and Extra Expense.

134.     Plaintiffs and the Class paid all premiums required under their respective policies and those policies were in full effect when an applicable government order described herein was enteredduring all relevant periods.

135.     Cincinnati has not honored and has no intention of honoring its obligations under the contracts to pay for lost Business Income and Extra Expense.

136.     The policies purchased by Plaintiffs and the Class require payment of direct losses caused by or resulting from the forced suspension of operations mandated by government orders

issued in North Carolina, including but not limited to Business Income and Extra Expense. Coverage for these losses is in no way limited or excluded under the non-negotiable policy terms sold by Cincinnati.

137. The policies further require payment of losses caused by action of civil authority that prohibits access to premises other than the insureds' premises where COVID-19—a non-excluded covered cause of loss—caused damage to those other premises; where access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and where the action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the COVID-19 pandemic that caused the damage. Coverage for these losses is in no way limited or excluded under the non-negotiable policy terms sold by Cincinnati.

138. Despite that the form policies sold by Cincinnati afford coverage, Cincinnati has uniformly taken the position, without seeking independent coverage advice, that its policy language does not afford coverage where government action limited or prohibited certain use, access, and deployment of the insureds' property or of other property, and that such claims would, as a business practice, be denied.

139. While representing to its insureds that it will diligently investigate business interruption claims connected to the COVID-19 pandemic, Cincinnati has told investors the truth: that it will not honor such claims. In its 10-Q filing for Q1 2020, Cincinnati explained its categorical position that "[b]ecause a virus does not produce direct physical damage or loss to property, no coverage exists for this peril."

140. Cincinnati's premeditated strategy to deny all COVID-19-related claims applies *even where an insurance policy does not set forth a virus exclusion*.

141.     Cincinnati's entire decision was rendered before Plaintiffs and Class members even filed their claims. Cincinnati has made clear that it has no intention of providing coverage. By making its intention known, and by subsequently denying all claims, Cincinnati has breached the contracts.

142.     Cincinnati's intended and forthcoming failures to affirm coverage and pay benefits represent a clear repudiation of the insurance policy contracts and thus constitute a breach of those contracts.

143.     As a result of Cincinnati's breach, Plaintiffs and the Class have suffered and will continue to suffer monetary losses, and without prompt relief may be forced to shutter indefinitely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for the following judgment:

A.     Declaratory relief as described herein;

B.     An Order finding The Cincinnati Insurance Company breached the policy contracts purchased by Plaintiffs and the Class;

C.     Compensatory damages;

D.     Special damages;

E.     An award of attorney's fees and costs, as provided by law;

F.     Pre- and post-judgment interest at the highest rate allowed by law; and

H.     Such other and further relief as this Court may deem just, equitable, or proper.

## **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury of the claims asserted in this complaint so triable.

34

Respectfully submitted this the 15th day of March, 2021.

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)
Email: ggupta@paynterlaw.com
Stuart M. Paynter (NCSB #: 42379)
Email: stuart@paynterlaw.com
THE PAYNTER LAW FIRM, PLLC
106 South Churton Street, Suite 200
Hillsborough, North Carolina 27278
Telephone: (919) 245-3116
Facsimile: (866) 734-0622

*Counsel for plaintiffs Death and Taxes LLC
d/b/a Death & Taxes and Bridge Club;
ASPIC, INC. d/b/a Poole's Diner; ABC
Cornershop, Inc. d/b/a Beasley's Chicken +
Honey, Chuck's Burgers, and Fox Liquor
Bar; Poole'side, LLC d/b/a Poole'side Pies;
and Aux Kitchen LLC*

35